Dual-Temp v. Hench Control. Mr. Hahn. Good morning, Your Honors. May it please the Court, Michael Hahn on behalf of the appellants, Cesar Bruin, Incorporated and Hench Control, Incorporated. I'd just like to start with an apology. I did appeal the district court's award of attorney's fees prior to the district court quantifying those fees. Appellate pointed out in briefs that the court does not have jurisdiction over that, so apologies. I'd like to move on to the other basis for our appeal, which is that the plaintiff failed to prove breach of contract at trial. So a little bit of background on the product. The product was a refrigeration control system that fit into a refrigeration system and controlled the temperatures and the humidity in a pizza manufacturing facility. What happened was that the refrigeration control system froze up and didn't communicate at times. And the plaintiff's proof at trial was simply it didn't function, therefore the defendants breached the contract. Well, there are a few salient points that concern a circumstantial case like that. First of all, in this case, of course, it was a component part. When a component part is placed into an environment, the component part might fail, but it also might be something in the environment that causes the component part to not communicate. Secondly, the product worked for a month. Now, this is something that the district court found the opposite in her opinion. She pointed to the testimony of three witnesses who said, in her opinion, said that they had indicated that it failed right away. But the actual testimony at trial was that it functioned for a month. Of course, in a circumstantial case, that suggests that something went wrong after a period of time and that the product actually performed as it was expected to do. The third point that I'd raise is that the cause was never determined. These three things put together blow holes in a circumstantial case. Now, I'm not disagreeing that if a product fails to function, that you can prove breach through circumstantial evidence. However, where equally plausible explanations for the failure are presented, then it would be improper for the district court to find and speculate that one of those causes is what caused the product to fail. In other words, it was improper for the court to find that the defendants breached the contract when there's equally plausible explanations. Into the environment that I just described where there are . . . Isn't that what the district court's job as the trier of fact was? In other words, to resolve that evidentiary conflict? To choose sides in the equally plausible explanation department? Respectfully, no. It wasn't her job to do that. Where there are equally plausible explanations, it's speculation for her to find that one of them was the cause. Where there's equally plausible explanations as to why the refrigeration control system lost communication, then the plaintiff hasn't proved their burden of proof of proving breach. The plaintiff's position is, well, there was something wrong with the refrigeration control system. But if there are six different potential causes that were presented at trial by the expert as to what could have caused this product to fail, then it's speculation for the district court to find that it was the product that was defective. Well, she had conflicting testimony, didn't she, as to this question of how soon it occurred? There were three witnesses. One was a startup technician that was employed by the defendants to come in and start. And he did indicate at his deposition that was admitted at trial that he had communication problems at startup. But he also said that that's not uncommon and that there are lots of problems when you get a piece of equipment like this in and they get things going. But the other two witnesses were the plant manager and the maintenance manager, who both said that it operated for a month prior to it having problems. So although facially it looks as though there's a conflict as to how long it took before this specifically the plant manager, Joe Burrus, who said it operated for a month fine before it started malfunctioning. And so the dual-temp argument in its brief is simply, well, that it didn't work. And our response is, well, it did work. If it hadn't worked from the very beginning, I think the evidence that it would be a defective product or that the defendants breached the contract would be a lot stronger. But if it worked for a month, then it opens questions. We did cite to your point, Your Honor, about the equally plausible explanation to three different cases, Hope v. County and DuPage, DWData v. Coakley, and Brown v. Parker-Harafin that indicated that this very point where there's equally plausible explanations for a breach, it's speculation for a trier effect to determine that one was the cause and one wasn't. Again, the operative language there being equally plausible. Well, the equally plausible part of this came from your expert, right? Yes. And the district judge was entitled to reject his testimony. That's true. And did, in fact, do so by finding that there was a breach here based on the testimony from witnesses, including an outside mechanical expert who concluded that your machine was, and its system, was the cause of the problem? Well, the district court's opinion was a little ambiguous on that, and I'd just point to Rule 52A, which requires the district court to set forth the reasons for her finding. The district court did address our expert, but what she said was that the plaintiff attacked his credibility, said that he was on pain medication, and she rejected that argument. She didn't say anything else about the expert. And I would expect that if she found that his testimony was unbelievable or if she was going to reject it, she would put that in as a basis for her ruling. The expert report that you referred to, the AMS report, does not come out and say that the communication problems were due to the refrigeration control system. What they say is it has something to do with the software. And then what they say is what should be done is that the, specifically, there's either a problem with the software or there's a problem with the software receiving data. The data is transmitted by the wiring, and the wiring was not installed by the defendants. The AMS report is ambiguous about, it doesn't specifically come out and say that the hinge control system was defective. It says it has something to do with the software, and they even suggested checking the line for noise. Well, the line is the wire connecting the sensors and the components to the control system. The wire is not part of what was supplied by the defendants. The wire was installed by the plaintiff and their subcontractors. Checking that for noise suggests that even the person that they had come out to check the system and find out what the problem was agreed that it could be something else, some environmental factor. And if the court has no other questions, I'll reserve my time. Thank you. Thank you, Mr. Hahn. Mr. Schiff. Thank you, Your Honors. Good morning. May it please the Court. The standard of review is a very high bar. It's clearly erroneous. Was the district court clearly erroneous in stating that, in finding that the defendants breached the contract? And the case law in this circuit is clear. Where there are two permissible views of the evidence, the facts finder's choice between them cannot be clearly erroneous. And there was a mountain of evidence. There was four and a half days of testimony and a number of depositions indicating all the different mountains of evidence showing where in it was the product just didn't work. This was a pizza manufacturing facility. And because this system had to communicate with the outside world and say, if there was a change in temperature that would ruin the product, it had to tell the people who were monitoring the system, hey, there's a problem. The temperature is going down. Worse, this was an ammonia-based system, and without communication, it's a disaster because you don't know if there's an ammonia problem. If it's not communicating, you don't know if there's an ammonia leak in the system. Now, the AMS, what Mr. Hahn was talking about, the AMS report, the only independent report, which was AMS hired by the general contractor. Dual Temp was a subcontractor who hired the defendants. AMS says, in conclusion, it is the opinion of AMS Mechanical, the communication failures has something to do with Color Master, which is a software program contained in the product. In the paragraph above that, it says the wiring would not cause this kind of problem. So it was not wiring that was done by somebody else. The expert threw out a bunch of possibilities that could be this, it could be that, based on certain documents that he reviewed from the defendants' counsel. He was never out on the premises. He never called a home run to say, hey, have you experienced a problem with electronic interference, with power surges, with this, with that. He never did that. It was just throwing out possibilities. The fact that he was taking painkillers, had just had surgery when he wrote his report, the judge found that the challenge to the intellectual rigor was unavailing, but not that she accepted his testimony. The system that was in prior to this system, there was never an issue. There was no issue. The evidence showed no issue with these external causes that were raised by the expert. And the system that replaced the hench system was installed, same wiring, same environmental conditions, never had a problem from day one through the trial, not one issue. So when the system had to be removed because home run in said, we can't deal with this continuing lack of communication, constant every couple of days. You don't know when it's going to happen. They said, get it out of here. AMS did the report, and then we brought in Select Technologies. Mr. Staley, who owns Select Technologies, testified, asked about all these atmospheric conditions. He said they didn't affect his system. It didn't have any issue. So these are red hearings. What's clear is that there was a problem with the software. What's interesting also, and while I know the courts reviewed all the briefs and the arguments, the context is important here. At the time that Dualtemp was negotiating with Mr. Hench, who was the original owner of the company, unbeknownst to Dualtemp at the time, he was selling his business. He was tired. He testified he was getting ready to retire. He was having some financial difficulties. He wanted to get out of the business, and he started shopping his business around. He had an inexperienced sales rep who had not sold anything for Hench before he dealt with Dualtemp. The sales rep asked Hench, do you want the specs on the prior system so you can see what they want done? He said, no, I don't need them. I just need you to fill out this questionnaire because it's just a matter of screws and connections. Then Hench sells the company before the system was even delivered to Dualtemp. It was not shipped until a month after the sale. While Hench was on a part-time basis, his role was limited, which he testified to. He hands over the task of loading the software, loading the system onto a computer to a brand-new tech, who Hench says was not very good, was prone to mistakes. He sent the wrong software. He sent the wrong wiring diagrams, and he didn't do any testing. Hench proudly stated in his testimony that he did testing before the product went out. In this case, it did not. He did not do the testing. Now, the new owner, Mr. Dannemann, had absolutely no experience in the refrigeration industry whatsoever, and ironically, he was the one troubleshooting the system. The recipe for failure was complete. If a system runs for a few weeks, it didn't. There were problems at startup, which council acknowledged, and then it ran for a few weeks, and then after that, it didn't run more than a few days at a time, is that delivering a working system? It defies common sense. It just defies common sense. And based on that, Your Honor, unless the court has any questions, we ask that this court affirm the decision of the trial court. Thank you. Thank you, Mr. Schiff. Mr. Hahn? Just briefly, Your Honor, clearly Erroneous Standard agreed that that applies here, but I think when the evidence is examined closely and the testimony of the expert is examined, it's clear that the district court made an error, and that's highlighted by the fact that in the district court's opinion, she cited two testimony that states the opposite of what she said that it held. She said that the system failed immediately, and the testimony that she cited to all said that it failed weeks afterwards, and that opens a hole in the circumstantial case. The only other thing I would mention that the counsel addressed was this AMS report. First of all, there were two reports. Both are addressed in the briefs. One was this that was independent by AMS, hired by the general contractor, and the other was an expert, Jason Gloria, who was hired by the defendants to find the cause of the problems, and they reached conflicting analysis. But the AMS report, to be fair, it does say, in the opinion of AMS Mechanical, based on the above observations, that communication problems has something to do with Color Master. It is either a problem with the software itself or a problem receiving the data from controller number one to Color Master. So in their very report, they say it may be a problem with the software. It may be the software itself. It may be in transmitting data from a controller to the computer and to the software. That is, there you bring in a possibility of another cause, something other than a defect in the system. How is that data transmitted? Through the wiring. The expert testified faulty wiring may be one of the things that causes a problem. Well, Color Master was part of the HENCH software, right? That's correct. That's correct. And their expert said it has something to do with it, but it may be the software itself. It may be a problem with the garbage in, garbage out. That's what you're going to get. Right, but either way it's on you. I'm sorry? The material point is either way it's on your client. No, because we didn't install it. We didn't install this. We sold the refrigeration control system to Dual Temp. Dual Temp reserved to itself the installation, and the expert testified about all sorts of different things that were occurring at the plant, power surges and drops, faulty wiring. They added a bunch of different things onto the system other than what they quoted, other than what they specified to HENCH. They added all these things on. All these different things happened after the system was installed. So it can't be on the manufacturer of the control system when the customer takes the product, adds a bunch of different things, doesn't install it properly, uses faulty wiring, and then it doesn't work. Well, that's what the expert talked about, and he didn't need to be there to know that. He was an expert in refrigeration control. He understood how compressors and sensors and wires work. He was able to say, and he didn't say this was caused by something else. He simply said here are six different things that could have caused these problems, or here are six different things that could have damaged the software so that you had problems later even if you fixed the wiring and even if you fixed something else. Now, all the evidence taken together, I think, presents an equally plausible explanation other than a breach by the defendants, and we'd ask that the court reverse the ruling of the district court. Thank you. Thank you, Mr. Hahn. Thank you, Mr. Schiff. The case is taken under advisement.